This morning is case number 418-0483. People of the State of Illinois v. Delargo Gullans. We'll show the appellant present by Mr. Mueller. Is that correct? And the appellee by Mr. Londrigan. You may proceed, counsel. Thank you. My name is Anthony Mueller. I represent D. Largo Gullans. Mr. Gullans was found guilty in 2012 of unlawful possession of a controlled substance with intent to deliver. He was sentenced to 30 years in the Illinois Department of Corrections. This cause comes before this court after a third-stage evidentiary hearing in regard to Mr. Gullans' post-conviction petition. Mr. Gullans has appealed based upon two elements or two premises of the law, which would be the trial court error in finding that there was no ineffective assistance of counsel, or the alternative, the trial court error in finding that the defendant had not proved actual innocence. I guess to start off, the most difficult part of the appellant's defendant's case is clearly the standard of review, in my opinion. And that's, I believe, a manifestly erroneous standard. So what we're talking about here is we have to establish that the trial court's ruling was indisputably false or manifestly or plainly false or wrong. And we will acknowledge that in the vast majority of cases that purview cannot be met. The difference, I think, here is that this is an exceptional case and one where, because of the trial court's written ruling as facts, we have several very important and very clear errors. So if I can start with the ineffective assistance of counsel claim, I won't preach to all of you about the law all that much, but obviously we have to prove that there was a deficient performance and that the deficient performance prejudiced the defendant or made the trial court erroneous. What was the deficient performance? So it's a combination of six or seven things that all, when combined, create deficient performance, mostly lead up to, really, the lack of being able to review stuff. So what we talk about is the lack of the defendant being able to review his own discovery and meet with his attorney prior to trial. So we talk about a bunch of things that, by themselves, wouldn't be a deficient performance. Not knowing the name of the town in front of the jury, calling it by the wrong name, not showing up for pre-trial, the attorney just blew off pre-trial. In front of the jury, calling the defendant the wrong name, his name's DeMarco, and he continually called him Domingo. Not filing, and this doesn't have a lot of effect, it's just kind of a sign, not filing a motion for a new trial when you know your client wants to appeal. And then this is also, there was a direct appeal on this issue, and the attorney's conduct on the direct was a relevant issue on the direct appeal. And I think that you can see that the attorney's conduct was, he was rude, he was a bit extreme. Now, all of those elements, those by themselves don't create a deficient performance. Everybody's rude in Livingston County. Pardon? Everyone is rude in Livingston County. Since it's recorded, I will say that has not been my experience in Livingston County. I do have to appear in front of them again. The real problem that we have here is that the defendant's attorney never met with the defendant prior to going to trial. The defendant's attorney never allowed them to see this stuff. The defendant's attorney only had one telephone conversation that only lasted a couple of minutes prior to the defendant going to trial. But counsel, I guess what it boils down to is, how can you tie these alleged deficiencies to an outcome that was different than it would have been had they not existed? And I think in this case, you've got it. One of the reasons I say this case is exceptional is because we have an incredibly clear record. Everyone here knows how criminal procedure in the state of Illinois works. So my client testifies he was in custody from the date he was arrested on this charge until the date he was found guilty in the jury trial. He testified that his attorney never came and saw him in the Livingston County jail. And to confirm that, he presented the actual jail records, which show that two attorneys came and saw him from a different firm. Okay. So let's assume that's true, that that's been established. What difference does it make with the outcome? Sure. So the fact that he didn't come to see him, because we know criminal procedure, tells us that he did not get a chance to review his discovery. That his testimony in regards to not reviewing his discovery is correct. Supreme Court rules prevent a defense attorney from giving somebody a discovery they have to keep in their exclusive possession or control. And we're all leading up to the lynchpin, which is the defendant's testimony was that after he got to prison, he requested his discovery. When he got his discovery, he managed to review it. And I believe it was Jeffrey Harris' statement to the police mentioning somebody by the name of Merck. My client knew who Merck was. It was Richard Felton. And he immediately knew the drugs were Richard Felton who had involvement. The drugs were Richard Felton's. And he actually managed to eventually get an affidavit and secure the testimony of Richard Felton. And our point here, the point here is that had the defense attorney, it's not always in the Justice Assistance Council not to show the discovery to your client. In fact, there's some case laws that have that. But in this case, had the defense attorney bothered to come down and see his client before the trial, and had the client been able to see the discovery, he would have seen the name Merck. Merck is the street name for Richard Felton. We don't know if he would have been able to secure the testimony of Richard Felton then. He was only able to secure it now likely because the person was in prison, easily accessible, and had a long prison sentence that they were hanging over their head. But even if he couldn't secure the testimony, it's relevant to the purposes of cross-examining Harris and Hester. It's relevant for the defendant's own testimony as to what he would testify to, whether or not he did. Tell us how that would have worked. Pardon? How would he have cross-examined the people who testified against him differently? You could at least – so they were asserting that it was – that they were flippers, rats, however you want to talk about it. But they were giving a reduced sentence in order to testify against my client. The initial statement mentions somebody else. You can certainly cross-examine them about who's Merck. Okay. Tell us how that cross-examination would go. I feel like it's tough under the circumstances in which I'm not the one cross-examining them. So they're on the witness stand. They said, no, he's not the guy who – And then the second part comes in. You could potentially get Richard Felton in, which we did get him. But regardless of whether – You mean before he was in prison for this lengthy sentence? I don't know when he was arrested on the lengthy sentence. All I know is that he was available at the time of the trial. But I guess what could have happened – I mean, you all ultimately decide what's relevant and what's not relevant. But the real issue that we have here is the trial court, in deciding that there was no effective assistance of counsel, only decided on the second portion was the – was there prejudice or would it have resulted in change. And in making that decision, she made the explicit written ruling that it wouldn't have mattered because the defendant was caught red-handed cutting heroin. That was her – that was what she said the facts actually supported. And that is not what the facts actually supported. The facts supported that Harris, the person that had turned state's evidence, testified. He saw the defendant near the drugs. The police testified. They saw someone run from the kitchen. They later found my client where the drugs – pardon me, where the person ran to. But there was zero testimony that the defendant was caught cutting heroin. That's what the real problem with this ruling is, is that if you believe that the defendant was caught cutting heroin, adding something to heroin, separating, manufacturing it, no amount of additional testimony really matters because, you know, you've got police eyeballs on the guy handling the heroin. What does it really matter? What if he's not handling it, but the kitchen table that he was at – educate me. What was going on in the trailer at the time that the person who turned out to be the defendant ran from the primary area of the entryway? What was going on? I believe that there were – there was some debate about whether the lights were on or off, but there were drugs along the kitchen countertop, I believe, is what we were at. And the drugs were what, in bags, in individual baggies? My understanding is they were in baggies. Two hundred and twelve plastic bags of drugs from the location where your client fled. Correct. It's always a circumstantial case. So you think the trial judge so misremembered the evidence that she thought the defendant was sitting there with his head over the table with baking powder or whatever and packaging this because she said he was caught cutting heroin? I think cutting heroin is a pretty explicit charge. It is. And this isn't an oral ruling that we're talking about. It's a written ruling. Well, what if that's her inference from the evidence? Two things. One, is she entitled to draw it, and two, is it wrong? I don't believe there's any way you can get an inference on the cutting. Something's going on with the baggage of heroin sitting there. Something's – they're being manufactured in some sense, aren't they, and why is it improper or incorrect for an unreasonable inference or trial fact to conclude that the person sitting at that table was the one engaging in the manufacture of this stuff? I think there's a difference between the person that may be responsible for engaging in the manufacture of something and affirmatively stating he was at the time caught red-handed cutting. Well, he's red-handed sitting at the table. I don't believe there's no testimony he was at the table. He's standing at the table. He's the guy that the police said were there and fled? Correct. That's it? So if she said he was clearly involved in the kitchen with this heroin when the police caught him, you wouldn't be here arguing? I think that if she had said he was in close proximity, our case would not be nearly as strong. Would you have any case at all? Yes, I believe that we do. We've got a flipped recanted testimony which isn't all that strong, but then we've got this additional testimony of somebody who came in and said this is my son. And what happened when he testified? The judge eventually ruled that it was because he was caught. So you didn't believe him? True, and I think that we can talk about the judge. I mean, the trial court is continually misunderstanding the evidence that is presented. I'll give you an example.  I told the Keith Bell felons to organize the patents. And the trial court interpreted that to be how could the defendant have not known about Richard Felton when the defendant was told to organize the patents by Richard Felton? The testimony was not that. It was a brother. Yeah, it was a brother. I mean, these are just, what's happening here is we're, I mean, even if it has to be remanded to correct the record, to correct the record to see if the record actually matches, the trial court is continuously misremembering the testimony. For example, we were talking about the actual innocence claim. But she said, how could he have, how could he say he didn't know when his testimony was he should have known before the trial? And the actual question being asked was, I knew before the, I knew, did you know before the trial or before the, when you were due discovery that Richard Felton could have been involved? My client said yes. There's a long, lengthy understanding of I reviewed the discovery afterwards. The trial court remembers it as he should have known at the time of trial because he admitted that he knew about Richard Felton at the time of the trial. That is not the testimony at all. So what we've got here is these, you know, we can call them little mistakes, but they keep piling up. We've got the brother, not the defendant, cutting when he's really just in close proximity. He should have known about it. He didn't know. He could if the testimony was he didn't know about it. I mean, ultimately what we have here, especially in ineffective assistance of counsel, is an attorney who doesn't even bother coming to see his client in jail, doesn't bother showing him discovery, and a trial court that maybe she meant to be in close proximity but didn't say that. We've got a really questionable verdict here under the circumstances in which the defendant is given so little opportunity to be able to have an effective defense. I want to understand that part about Felton again. Defendant, would you concede at this point, the evidence is overwhelming, that your client was in the trailer? Oh, he was definitely in the trailer. There's no doubt about that. And he knew who Merck was. He did. He knew who Merck was. Right. He didn't know that Merck was mentioned in discovery, but he knew who Merck was. Right. And according to him and the other people in the trailer, Merck is a bigger dealer. I don't know if he's bigger. He would be another person. He's a dealer, basically. Well, he's a guy that brought, I don't know, maybe I'm naive about size, but 200-plus packets at a time. Sounds like a lot. Oh, for sure, yes. Okay. And he's the one that was responsible for those packets, according to the defendant's theory of the case now. Exactly, yes. So the defendant is in the trailer. He must see the packets of heroin because they're displayed on the camera. I mean, they're out, right? I think his testimony at the trial was he did not see them right away until the lights were turned on. So there was some debate at the trial whether the lights were on or off in the trailer. Describe to me again where they were sitting in the trailer. They were sitting on the, I believe, the kitchen counter. Lined up. Correct. Okay. So if the fact finder infers that he saw them, and he knows who Merck is, and he knows Merck is a dealer, and he knows that Merck apparently has had some association with the people that he's in the trailer with, what difference does it make whether he reads about it in discovery? Doesn't he know it at the time? Well, I believe the testimony was he didn't know that it would have been Merck's drugs until he read it in the discovery. Whose drugs did he think it was? I don't think he had any clue whose drugs it was. What he knew was Harris's, and he knew, I mean, based on their testimony at the trial, he would have known that Harris and that Hester were actively involved in this. However, in terms of the higher-up, the person promoting this whole show, I believe his testimony was fairly clear. He didn't know about that until he read the discovery and got the name of who was actively involved in this. His argument was, I believe, he was there to pick up his child, so it's a wrong place, wrong time type of argument. And ultimately, when you've got a new witness that comes in and says, it's all mine, and that witness could have been available at the time of trial had your attorney bothered to show you the discovery. That's, to me— What about the trial court's finding that Felton was unable to even provide basic information on this so-called operation that he was running? Do you dispute that in any way? I believe that that is—it's an incorrect statement based upon testimony, but it's not as explicitly incorrect as the cutting of the heroin or who was involved in organizing that case. Why is it incorrect? Well, Felton did testify as to what the package looked like. He said—actually, he said they kind of looked like the exhibit stickers sitting up on the bench. He testified that they would have been involved— they would have been placed—they would have been— he testified as to the amount of the cut, which would have been 5 grams of illegal substance and 15 grams of a non-illegal substance would have been cut. Now, was Felton there that day? Felton did testify that he was there that day. He testified he left approximately an hour before the police ended up raiding it. So no one saw him enter or exit the trailer, whereas an officer saw your client run from the kitchen area. So the officers testified that approximately— they started the surveillance about an hour beforehand and Felton testified that he left about an hour beforehand. So we're in a situation where his testimony— this is—Felton did not hear the officer's testimony. Would that have been in the discovery? Felton, what time? What time they started. I'm not even entirely sure. I don't have all of his discovery. Well, did Felton testify, I brought the drugs to the trailer and instructed them as to the process, the cut, the proportion, and then they did that for me? I mean, what else did he say besides, yeah, it looks like those kind of baggies and we switch baggies or we'd use different baggies at different times? I believe his testimony was that he operated his drug lab out of the trailer, that he was using Harrison and Hester to run the drugs, and Keith Gullen, the defendant's brother, was involved in the drug trial. How did the drugs get to the trailer? Did Felton testify he brought them there? If it wasn't explicit, it was very obvious from the testimony that that was his— so I don't want to say the wrong thing, but I think if you read his testimony, it's very clear. He's saying that he was—he felt himself the dictator of the drug. So is Felton testified after he was convicted and now serving a de facto life sentence? Is that right? Assuming that he doesn't have—yeah. The answer is yes? The answer is yes, assuming he doesn't end up being successful. Okay. So your position is that somehow if the defendant had been first discovering and seeing Felton's name, we knew from Merck as his alias, that they could have then called Felton? Do you think he's then going to testify at trial before Felton himself was convicted as he did at the post-conviction hearing? Potentially. I want to be clear, though. So you don't—he's just going to step up there while he's still facing criminal liability himself and admit all this? Take on another case? I'm not going to say that it happened. It's speculation as well. Well, on what basis, if he doesn't, then what do you got? What's the basis of your claim that Felton's— the revelation of Felton would have made a difference? Because you could potentially cross-examine additional witnesses about somebody else's involvement and see if you can get them to be tripped up. I mean, ultimately, what we're talking about here is all of the problems we always have within the effective assistance counsel thing when you're talking about whether or not it really would have changed the trial. What I'm trying to tell you, I believe this is more of a stronger one because you have really extreme conduct by the defense attorney. I don't know what defense attorney decided it was a good idea to never show discovery to his defendant. That's crazy. It may not be an effective assistance counsel in every case, but it's a pretty extreme action. Actually, this is a bench that has lots of experience at the trial level with criminal cases. I'm personally familiar with lots of criminal defense attorneys who never showed the discovery to their clients but would talk to them about what it revealed. It was a matter of policy. I thought it was a bad idea to actually show them the discovery. Is this a distinction you're trying to draw here? I think that that's certainly another way to approach it, but what we're talking about is the undisputed testimony is he never saw him. He had one telephone call with him. So we don't have this alternative of I don't show him the actual discovery, but I go over it in extensive detail to be prepared for trial. So it's really, I guess it's a little more broad than what my initial description is. Never showed him discovery, never came and met the defendant when he was asked to prep for trial. That, I think everyone can agree, you don't go to a jury trial where someone faces a class-act sentence and you don't go to jail to be able to talk to the prior jury trial. That's an extreme... Who is post-conviction counsel in this case? I was post-conviction counsel. Did you call Stuart Goldberg to testify and ask him these questions? What did you do? Why did you do it? I didn't call him as a witness at the time that he... Why not? Because he was... I don't know if he's still alive. I know he was in prison. I called him to try to talk to him about it, but I didn't call him as a witness. Because why did you say? He was very, very... Okay. I'm not sure if he's still... Counsel, you're out of time, but you will have additional time on rebuttal. Thank you. Mr. Londrigan. Thank you, Ms. Coleman, counsel. After listening to all the questions that the court just answered, I'm pretty much out of thunder. I see this pretty much as a credibility issue. Obviously, the trial court is in a superior position to look at the witnesses in order to make a testimony and to make judgments about whether or not they're believable, and I think that's what the court did in this instance. Counsel, what's your take on what opposing counsel calls these misstatements by the trial court? I don't think they are misstatements. I just think the trial court is listening to a great deal of information and coming to its own conclusions about what happened. Mr. Pelton states in his affidavit that he was cutting heroin with Ms. Hester's credit card, I think was the statement he made. And so somebody's cutting heroin, and we have a defendant sitting at a table with 212 bags of individually wrapped heroin, and he doesn't know that they're right in front of him. What's he doing with those bags? I think a fair inference there is he's the one cutting them or doing something with them. So I think that reference by the court was just a suggestion that he was handling the heroin at the time of the drug bust. Two issues that we have, I think, is the fact that the court is using the term cutting inappropriately. I don't think so. As I just stated, I think the court is making an inference from all the information that's presented before it. The next issue I think that's out there is whether or not this defendant would have known about Mr. Pelton in the absence of reading the discovery. I find that impossible to believe as well. He's sitting in a trailer, a very small, confined space, with 212 bags of individually wrapped heroin in front of him, and when the police knock at the door, the police see him get up from the kitchen area and run to the back. Another occupant of the trailer, Mr. Harris, sees the same thing and testifies to it. Mr. Pelton testifies that he was there an hour before. Miraculously, he was not seeing the lady in the trailer. Well, if he was there an hour before, the defendant must have seen him there. So if the defendant saw Mr. Pelton leave the trailer an hour before, leaving 212 bags of heroin on the kitchen counter, I think he knew about Mr. Pelton's potential involvement in this issue while he was in the truck. And I think that was the inference that the trial court was trying to make in its work. Mr. Pelton cannot possibly be a new witness. He cannot be someone who was just revealed by having looked at the name Merck mentioned in the discovery. And so there's no credibility in Mr. Pelton's testimony. There's no credibility in Ms. Pelton's testimony. And the whole version of events that's attempting to be painted by the defendant is pretty far removed from logic. And I think that's what the trial court looked at. That's what the awarder says. I think she was pretty clear in her appraisal of the believability of these witnesses. And I think she made the proper ruling. Any questions? I don't see any at this time. Thank you, counsel. Mr. Mueller, any rebuttal? The comment, the trial court's ruling was not just he was cutting the heroin. The trial court's ruling was he was caught red-handed cutting the heroin. And I don't see any set of facts whereby – there are certainly set of facts where you can say, well, he was caught red-handed near the heroin. He was caught red-handed in close proximity to the heroin. And I guess all of those leave open the possibility that you lacked the knowledge necessary to form possession. If the trial court really believed that he was actually physically cutting the heroin, then under those circumstances, there would be no element of possession. Knowledge would be there, knowledge and the ability to exercise control. He clearly had the ability to exercise control. The question is did he have knowledge? And the act of saying he was cutting the heroin jumps to the point where he had to have had knowledge. So I think if you look at this transcript, there's no set of inferences where that's an accurate description of what actually happened. And not only that, it's a far – it's a way more significant reach than anything that's ever put in there. Kind of like a counsel, with all due respect, said these are all fair inferences. Well, it's not a fair inference that you messed up the defendant's brother and defendants. That's just a clear-cut error. And this record has these errors over and over and over. What's the inference that the jury drew? In regards to? What the defendant was doing in the trailer and what was going on. Well, the jury obviously believed that he was in possession of the substance. But that was without being able to present a defense that involved this other individual, this other witness. There's also no testimony that Mr. Feldman and Mr. Gullen were there at the same time. There's no testimony that they overlapped. Mr. Gullen's testimony was he did not know that Merck had any involvement until he read the name Merck. And then that set off a warning bell to him of who this actually was and what they were actually dealing with. But as opposing counsel indicated, isn't that a problem when you consider when police started their surveillance? I don't believe it is. The police said it was approximately an hour before. And that's another conjunct that the trial court makes, which is Sergeant Hamilton should have seen Merck leaving. Well, he said he left about an hour before, right? Yeah, so he said, Sergeant Hamilton, I don't know if it's in my brief, but he was not explicit on when he started the surveillance. He put it as an approximation. So I think that clearly it could have been 50 minutes, it could have been an hour, 10 minutes. So you could have drawn an inference either way, correct? Right, and the trial court drew the inference that he must have seen him. He wasn't there. He must have seen him or felt he was not there. That is what her ultimate ruling was. Well, that's just disbelieving felt. Well, but it's also failing to acknowledge that the officer wasn't explicit about when he ended up doing the surveillance. Well, it doesn't make any difference what the officer says if we know, and I think we know, that the defendant was in the trailer. The defendant was in the trailer prior to the surveillance because the defendant didn't arrive while the surveillance was going on. Is that correct? I don't believe that's accurate. The trial testimony of the defendant was not part of the original suspects that were involved. Yeah, but would the police officer know whether anybody came after he started watching? The police officers did test, if you look at the actual trial transcripts, I believe the officers testified that several people were coming and going, including Keith Owens was one of them, and they were unloading things. I don't believe they could identify everybody that was going in and out. So from your perspective, it could have been the defendant coming and going. Yeah, there's certainly no explicit testimony of this is when I saw this guy come in. He came in two hours before. The officers couldn't identify exactly when he actually ended up coming in, is my recollection of the transcript. So it's not a situation where you can say, well, I saw nobody went in that place or out that place for the full hour. That would be a stronger case for the state of Minnesota. Any other questions? I don't see any, counsel. Thank you for your time. Thank you. We'll take this matter under advisement and be in recess until the next case.